THE STATE ex rel. CITY OF DEXTER v. JOHN
P. GORDON, State Auditor.

In Banc, June 28, 1913.

1. CITY INDEBTEDNESS: Constitutional Limitation Prohibitory: Strictly Construed. The provisions of sections 12 and 12a of article 10 of the Constitution, declaring that no city shall be allowed to become indebted in excess of ten per cent of "the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of said indebtedness," are prohibitory self-enforcing, and to be strictly observed.

2. ————: What Assessments are Meant: Must Be Those Completed by State Board. The assessments to be considered in determining whether a proposed indebtedness exceeds the constitutional limitation, in view of the words that such indebtedness cannot exceed ten per cent of "the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes," are the two successive, antecedent, completed assessments made by the State Board of Equalization previous to incurring the indebtedness; that is, previous to the time of the popular election to increase the indebtedness. If it was proposed to hold an election to increase the city indebtedness, and the assessment as of June 1, 1911, had not then been completed by the State Board of Equalization, the taking of the assessment as of June 1, 1910, as the basis, would not be in compliance with the Constitution, for its language means that it must be "the assessment next before" that completed assessment. The assessment that the Constitution contemplates was the one as of June 1, 1909, and if the taxable value of the property within the city. as shown by that assessment, was $485,466, a bond issue of $53,000, voted in August, 1912, was in excess of the constitutional limit, and the State Auditor properly refused to register them. *Held*, by BOND, J., dissenting, with whom GRAVES and FARIS, JJ., concur, that the indebtednes is not incurred until the bonds are authorized by the city council, after a vote of the people authorizing the indebtedness; and if at that time, the assessment for 1911 had been com-

pleted by the State Board of Equalization, although it had not been completed at the time of the popular vote, the assessment of 1910 should have been taken as the basis for ascertaining the amount of debt the city might incur; and as the vote was taken in August, 1912, and the State Board completed the assessment for 1911 in September, 1912, and the city council by ordinance in October, 1912, authorized the issuance of the bonds, the two assessments properly considered were those of 1911 and 1910, and the one of 1910 was "the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness," and as that assessment showed an assessed valuation of $557,786, bonds to the amount of $53,000 were legal.

3. ———: ———: **Duty of Auditor.** The State Auditor is not a judicial officer, but every executive officer when called upon to act officially must determine whether upon the facts the law requires him to do a certain thing.

## Mandamus.

WRIT DENIED.

*Thomas N. Dysart* for relator.

(1) An assessment cannot be considered completed until it has passed the State Board of Equalization. Prickett v. Marceline, 65 Fed. 469; Lake County v. Standley, 24 Colo. 1; McLean v. Valley County, 74 Fed. 389. (2) The limit of indebtedness is determined by the assessed valuation in force at the time bonds are issued and not by the time they are voted. 1 Dillon on Municipal Corporations (5 Ed.), sec. 207; Corning v. Mead County, 102 Fed. 57; Prickett v. Marceline, 65 Fed 469; Dudley v. Lake County, 80 Fed. 677; Electric Co. v. Newton, 42 Fed. 723. It will be noted in connection with a review of the above cases that neither our Constitution nor our statute prohibits voting or authorizing bonds in excess of constitutional limitation; they merely prohibit their issue, the words

used being "nor shall any indebtedness be allowed to be incurred." (3) The vote of the electors did not create an existing indebtedness. The debt is not incurred until the bonds are issued. Electric Co. v. Newton, 42 Fed. 723.

*John T. Barker*, Attorney-General, and *Ernest A. Green*, Assistant Attorney-General, for respondent.

(1) An assessment cannot be considered as complete until it has passed the State Board of Equalization. Therefore, the assessment based on ownership as of June 1, 1911, not being equalized, at the time the bond issues were voted, August 5, 1912, was not an assessment within the meaning of the Constitution. Secs. 12 and 12a, art. 10, Constitution; Sec. 9544, R. S. 1909; Sec. 11411, R. S. 1909; Prickett v. Marceline, 65 Fed. 469; Lake County v. Standley, 24 Colo. 1; McLean v. Valley County, 74 Fed. 389. (2) The limit of indebtedness under sections 12 and 12a of article 10 of the Constitution is determined by the assessment next before the last at the time the bonds are voted by the people, and not at the time the bonds are actually issued. Therefore, both bond issues are invalid in this case, and the bonds are not entitled to registration. Secs. 12 and 12a, art. 10, Constitution; Sec. 9544, R. S. 1909; Prickett v. Marceline, 65 Fed. 474; State v. Babcock, 24 Neb. 640; Railroad v. Wilber, 63 Neb. 627; Evans v. McFarland, 186 Mo. 726.

WALKER, J.—This is a proceeding by mandamus instituted by the relator, a city of the fourth class, against the respondent, the State Auditor, to compel the latter to register certain bonds.

251 Mo.—20

The respondent refused to register the bonds, and relator applied for and was granted an alternative writ of mandamus in this court, to which the respondent made return, alleging among other things that said bonds were illegally issued, a more detailed statement of said return being hereinafter set out.

The facts as disclosed by the petition are as follows:

On the 16th day of July, 1912, said city enacted an ordinance directing a special election to be held on the 5th day of August, 1912, for the purpose of voting on two propositions: (1) to issue $25,000 in bonds to provide funds to construct a public sewer system; (2) to issue $28,000 in bonds to provide funds to construct a system of waterworks; said election was held at the time appointed; the two propositions were voted on separately, and more than two-thirds of the votes cast on each were in favor of same; the returns of said election were canvassed and the result was properly declared; on the 7th day of October, 1912, the board of aldermen, by an ordinance duly enacted, authorized the issuance of said bonds; ordinances were also enacted providing for the levy of taxes to pay the principal and interest on said bond issues.

The assessed valuation of the taxable property within said city, based on the ownership as of June 1, 1909, amounted to $483,466; the assessed valuation of the taxable property therein based on the ownership as of June 1, 1910, amounted to $557,786. Said bonds were presented to the Auditor for registration on the 7th day of October, 1912. In determining the per centum which the total amount of said bonds bore to the taxable property of said city, the board of aldermen was governed by the assessed valuation based on the taxable ownership of property therein as of June 1, 1910.

On the day of the special election for voting upon the issuance of said bonds, to-wit, the 5th day of August, 1912, the State Board of Equalization was still in session performing the duties prescribed by section 11411, Revised Statutes 1909, that is, the equalization of the values of real and personal property among the several counties of the State, as for June 1, 1911, for the purpose of taxation, and said State board did not complete its duties until the 1st day of September, 1912. It is admitted that the requirements of the law in regard to the presentation of said bonds to the Auditor for registration, and the tendering of the proper fee for same have been complied with.

Respondent's return to the alternative writ of mandamus issued herein was to this effect: (1) that said writ did not set forth facts sufficient to entitle relator to relief; (2) that it appeared on the face of said writ that on the date of the election therein referred to, the State Board of Equalization was in session engaged in the performance of its statutory duties of equalizing the valuation of real and personal property among the several counties of the State, and had not at that time equalized the assessment based on the ownership of said property as of June 1, 1911; that under the Constitution of this State, sections 12 and 12a of article 10, relator could not become indebted to an amount exceeding ten per centum of the valuation of its taxable property based on the ownership of same as of July 1, 1909, on which date the assessed value of the taxable property of relator amounted to $488,466; that the total amount of the indebtedness of said relator, including the aggregate amount of said bonds presented for registration, was $54,500.

The only question for consideration is whether the total valuation of the property of said city has been based on the proper year in determining whether

the per centum which said bonds bear to same is within the limits of the Constitution.

A review of the provisions of the State Constitution relative to the matter under consideration is necessary to determine whether the peremptory writ should be issued or the proceeding dismissed.

Sections 12 and 12a of article 10 of the Constitution prohibit any subdivision of the State, therein named, from incurring any indebtedness City Indebtedness. in any year in excess of the income and revenue for such year, unless at least two-thirds of the voters of such subdivision assent to such indebtedness, which in no event can exceed ten per centum of the total assessed value of the taxable property of such subdivision at the assessment of same next before the last assessment made by the State Board of Equalization, previous to the incurring of such indebtedness. That these sections are mandatory is evident from the purpose of their adoption, which was to definitely limit the power to incur indebtedness and to base same on an assessment sufficiently remote that the advantages, real or speculative, derived from the incurring of such indebtedness, may in no way influence the assessment of the property of such subdivision. Being mandatory these sections should be strictly construed, and each step required to be taken literally followed. In 2 Lewis's Sutherland on Statutory Construction (2 Ed.), sec. 627, p. 1135, the rule deduced from many cases is that to render a mandatory law available its directions should be strictly complied with. Unless this is done, the proceedings thereunder are void. This rule is applicable to constitutions as well as statutes. A deviation therefrom would tend to defeat the purpose of the framers of the Constitution. Selfish interests prompted by a desire to increase indebtedness might, if a next previous assessment were taken as a basis, put influences at work to so increase the assessment

as to accomplish their purpose. [State ex rel. v. Cornwell, 40 S. C. 26.] This is impossible if the constitutional mandate is obeyed. The Constitution, in this regard, is a prohibition, and, therefore, self-enforcing, as has been declared by this court in Hannibal & St. Joseph Railroad v. Board of Equalization, 64 Mo. 294, and State ex rel. v. Van Every, 75 Mo. 530.

To summarize, it follows that to create a valid indebtedness certain prerequisites are necessary:

————:
Necessary
Steps.

First, the constituted authority of the subdivision of the State must ascertain the total value of the taxable property of same at the assessment next before the assessment previous to the incurring of the indebtedness; and, second, if it be found that such indebtedness will not exceed ten per centum of the assessed valuation of the property of such subdivision, based on the assessment required to be taken to determine such per centum, then a proposition must be submitted to the voters to enable them to approve or reject such proposition; if approved by the required majority, bonds may be issued which before negotiation are to be registered by the State Auditor.

The "assessments" designated in the Constitution as necessary to be considered in determining the

City
Indebtedness:
Assessments.

per centum of indebtedness, mean the two successive, antecedent, completed assessments made by the State Board of Equalization previous to the incurring of the indebtedness. [Culbertson v. Fulton, 127 Ill. 30, l. c. 37; Wilkinson v. Van Orman, 70 Iowa, 230; Prickett v. Marceline, 65 Fed. 469; Railroad v. Wilber, 63 Neb. l. c. 627.] This must be true, for until the State Board of Equalization has completed its labors the total amount of taxable property in any subdivision cannot be determined. The authorities cited afford ample

support for the correctness of this conclusion. If space permitted, the unanswerable arguments in this behalf of PHILIPS, J., in Prickett v. Marceline, supra, afterwards affirmed by the United States Circuit Court of Appeals, might be appropriately quoted.

On completed assessments, therefore, the constituted authority of any subdivision must base its action in determining the per centum of indebtedness. By way of illustration, it if was proposed to authorize the incurring of an indebtedness in 1912, and the assessment as of June 1, 1911, had not been completed, the taking of the assessment as of June 1, 1910, as the basis, would not be in compliance with the Constitution, for the reason that the assessment required to be taken is that of June 1, 1909.

The closing clause of the constitutional limitation under discussion, expressed in the words "previous to the incurring of such indebtedness" has reference to the time when the constituted authority of a subdivision is required to ascertain whether the proposed indebtedness exceeds the constitutional limit and not to the time when such debt, if authorized, will become obligatory.

The foregoing general deductions are applicable under the facts in the case at bar. Relator, the city of Dexter, is one of the subdivisions named in the Constitution; the board of aldermen of said city is the constituted authority under the statute (Secs. 9355, 9544, R. S. 1909) to initiate a proceeding for the incurring of an indebtedness and to issue **Excessive Indebtedness.** bonds, upon being legally authorized so to do, in payment of same. Acting under this power, said board adopted an ordinance directing the holding of a special election for the purpose of enabling the voters to approve or reject a proposition for the issuance of bonds aggregating the

sum of $53,000. The board in ascertaining whether the proposed indebtedness was within the constitutional limit took the assessment as of June 1, 1910, at which time the assessment of June 1, 1911, was not completed. On this basis the proposition was submitted to the voters, who approved same by the required majority and the bonds were issued, and submitted to the Auditor for registration. The action of the board in taking the assessment as of June 1, 1910, was unauthorized, and the assessment as of June 1, 1909, should have been taken as the basis because it was "the assessment next before the last assessment previous to the incurring of the indebtedness;" but the assessed value of the property of said city as of June 1, 1909, was $485,466, and the indebtedness sought to be incurred was $53,000, or more than ten per cent of said assessment.

The action of the board not being in compliance with the Constitution, and the proposed indebtedness being in excess of the prescribed limit, **Prerogative of Auditor.** the bonds are void. The statute (Sec. 1275, R. S. 1909) does not call for judicial functions on the part of the State Auditor. He is an executive officer. But every executive officer when called upon to act officially must inquire into and determine whether on the facts the law requires him to do one thing or another. [Hoff v. County, 110 U. S. 53.] The Auditor has determined in this case, and properly so, that the requirements of the Constitution have not been complied with; the peremptory writ should, therefore, be denied and this proceeding dismissed. It is so ordered.

*Lamm, C. J., Woodson* and *Brown, JJ.,* concur; *Bond, J.,* dissents in opinion filed, in which *Graves* and *Faris, JJ.,* concur.

## DISSENTING OPINION.

### STATEMENT.

Relator, the city of Dexter, asks for a mandamus to compel State Auditor to register bonds for $25,000 issued by relator on the 2nd of October, 1912, to provide funds to construct a public sewer, and to register bonds for $28,000 issued on the same date by relator to procure funds to construct waterworks. Authority was given to issue such bonds by vote of its inhabitants on the 5th of August, 1912. At the time said vote was taken the State Board of Equalization had not fully completed the task of equalizing the assessments of real and personal property contained in the city of Dexter as for the year 1911, but did complete its work and adjourn on the 1st day of September, 1912, so that this assessment of property was in all respects finished one month before the issue of the two sets of bonds above mentioned. The assessment of the property in said city on September 1, 1912 (for the year 1911), amounting to $562,079 (for the year 1910), the next prior assessment to $557,786, the next prior assessment (for the year 1909), amounted to $486,466. The amount of the assessment (for 1910) was large enough to warrant the issuance of the aforesaid bonds, since the amount of the bonds and all other indebtedness of the relator city was less than ten per cent of the assessment. And the only question presented for our decision, is whether, under the Constitution, the bonds in question were lawfully issued on the 1st of October, 1912, at which date the assessment of the relator's property as of the years 1911 and 1910 had been completed in all respects. It is conceded by both parties that the constitutional provisions have been complied with in all respects in procuring the assent of the voters in providing for the payment of the bonds and that they

should be registered, provided the assessment of 1910 was the legal basis for their issuance.

## OPINION.

### I.

BOND, J. (After stating the facts as above).— The constitutional provisions relating to the issuance of the bonds in question are, to-wit:

"Sec. 12. *Municipal indebtedness, limit of—how increased—exceptions as to St. Louis and Kansas City*—No. . . . city . . . shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose; nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness: . . . and provided further, that any . . . city . . . incurring any indebtedness requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same. . . ." [Art. 10, sec. 12.]

There is another constitutional amendment (article 10, section 12a) which permits cities of the class of relator to incur a further indebtedness not exceeding five per cent to purchase, construct and own waterworks, etc., which does not otherwise differ from the foregoing and therefore is not inserted and for the

same reason the statutory provision on the subject, Revised Statutes 1909, section 9544, is not copied.

The purpose of the adoption of the above constitutional amendments providing for the increase of indebtedness to buy waterworks and electric light plants, etc., was considered by this court where it was said, in sustaining a *purchase* of an old waterworks plant, that this might be rightfully done, although not falling within the letter of the Constitution. The court added in speaking of the language of the Constitution: " 'The construction must not be so strict or technical as to defeat the evident objects and purposes of their creation.' We think the amendment to the Constitution was designed by the people to enable cities of the population named to provide themselves with water and light and to encourage municipal ownership of the water supply and lighting facilities." [State ex rel. v. Allen, 183 Mo. 291.]

Strict Construction.

Again, this court has said, speaking of the constitutional provisions referring to bond issues (Constitution, art. 10, sec. 12), that it approved and adopted the following language of Mr. Story as to the rule of construction, to-wit: "Every word employed in the Constitution is to be expounded in its plain, obvious and common sense meaning, unless the context furnishes some ground to control, qualify or enlarge it." [1 Story Constitution (5 Ed.), sec. 451; State ex rel. v. Walker, 193 Mo. l. c. 710.] With this view of the objects of the above constitutional amendments and the method of arriving at their meanings, let us turn to the language of the provision. An inspection of the terms of the first constitutional amendment shows that it was adopted to give the city power by the scheme there stated, to contract debts beyond what could be paid from its yearly income and revenue, upon two conditions: (1) that two-thirds of its voters at a special election should assent to the future creation of the

proposed debt; (2) that before such indebtedness should be contracted or created the amount thereof added to all other existing indebtedness, to the city, should not exceed five (now ten) per cent of the taxable property therein, to be estimated on "*the* assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness." When these two steps are taken and provisions made for the debt and interest before or at the time of taking the second step, then the Constitution validates the indebtedness. The meaning of the language which defines these duties is too plain for comment, for it is as directly and simply stated as words can make it. There is not a word, a line, or a sentence, in the provision under review, which puts any other burden upon a city, seeking to achieve the laudable purpose of owning its own sewers and waterworks. Every one of these constitutional requirements was strictly complied with in the present case, for on October 1 and 2, 1912, when the bonds were actually issued, there *was* in existence a completed assessment for 1911, and the next prior assessment for 1910 was amply sufficient, at the constitutional ratio of ten per cent, to justify the making of the contract expressed by the bonds.

The only possible doubt which could arise is, as to whether the issuance of the bonds or the vote of authority to issue them, *was the incurring* Assessment *of the indebtedness?* This question as to Meant. *how* and when such indebtedness is incurred, has been set at rest by all the cases, which have dealt with it. It was directly adjudged by the Federal court and in a case having the same object (erection of an electric plant) sought to be accomplished by the city of Dexter, the relator herein. It was claimed there that, under the assessment existing when the vote was taken, the proposed bond issue would exceed the constitutional limit, but it was shown further

that, when the bonds were in fact issued, they did not exceed five per cent of the assessed value of the property as prescribed by the Iowa Constitution, for another assessment had been completed before the actual issuance of the bonds. The court held for that reason they were valid, using this language: "The vote of the electors did not create an existing indebtedness. It authorized the city to undertake the erection of an electric plant. The city authorities in carrying on this work, are subject to the constitutional limitation; but no debt was created until the bonds were issued and sold, and at *that time* the indebtedness was not increased over the limitation by the sale of the bonds." (Italics mine.) [Thompson Houston Electric Co. v. City of Newton, 42 Fed. l. c. 728.]

The same doctrine was announced in the Circuit Court of Appeals for the Eighth Circuit. There the court used the following language: "The debt created by the bonds in this case was incurred, not at the time the board of commissioners determined that it was necessary, nor *when the qualified voters of the county gave authority to incur it,* nor at the date of the bonds (they having been antedated), but at the date, later than September 6, 1880, when the bonds were in fact issued and sold." [Dudley v. Board of Commissioners, 80 Fed. l. c. 677.] (Italics mine.) And again, the United States Circuit Court of Appeals (CALDWELL, SANBORN and THAYER, Circuit Judges) said: "The assessed valuation in 1879 was properly rejected, because, although the vote for the bonds was cast in the fall of that year, they were not issued until July, 1881, long after the assessment of 1880 had been made; and it was the assessed valuation *when* the bonds were issued, and *not* when the vote for them was cast, that measured the permissible debt." [Board of Commissioners v. Sutliff, 97 Fed. l. c. 281.] (Italics mine.) Finally it was said by the same tribunal and the same three circuit judges, speaking on

the exact point involved in this proceeding, to-wit: "The defense that the bonds are void because their aggregate amount is in excess of the statutory limitation rests upon the proposition that the limitation is to be measured by the assessed valuation of the property of the county in the year in which the bonds were voted (1886), and not in the year in which they were issued (1888). The position is untenable, and the question it seeks to present is no longer open to discussion in this court. The assessed valuation by which the statutory limitation is to be measured is the last assessed valuation of the property of the county *before* the bonds are issued, *not* the last one before they are voted or directed to be issued." [Corning v. Board of Commissioners, 102 Fed. l. c. 58.] (Italics mine.)

Equally clear, explicit, and conclusive on this subject is the doctrine stated in the text, 1 Dillon on Municipal Corporations (5 Ed.), p. 403, sec. 207, to-wit: "Where a vote is required, the validity of bonds issued pursuant to such vote is to be determined by the last assessed valuation of the property before the bonds are issued, not the last assessment before they are voted or directed to be issued."

Again the question was necessarily involved and decided likewise by this court speaking through LAMM, J. The case involved a construction of the exact terms involved in the present case, to-wit, the time of "incurring any indebtedness," for the Constitution speaking of school districts prescribed that, "Any . . . school district . . . *incurring any indebtedness* requiring the assent of the voters as aforesaid, *shall before or at the time of doing so,*" make provision by annual taxation to pay the interest and create a sinking fund for the payment of the principal. Said the court: "The Constitution required the school board to provide for the collection of an annual tax for a sinking fund and to pay the interest; it says this must

be done at the time of incurring the indebtedness or *before* that time. Here it was done before the bonds were actually sold and delivered." Just before deciding this point the learned judge, in stating what was not before him, said we are not called upon to decide what funds could be used "to pay interest on, and creating a sinking fund for, school bonds not sold and, therefore, in no sense an indebtedness of the districts." [Black v. Early, 208 Mo. l. c. 312.] (Italics his.) This language taken together necessarily implies by exclusion and inclusion that the indebtedness was incurred *when* the bonds were actually sold and delivered. This decision is correct, controlling and completely in harmony with the law. We have not been able to find in the whole range of the adjudged law a case to the contrary.

I take it, therefore, that as has been shown, the indebtedness for the bonds in question was not incurrable until the issuance and sale. Hence no doubt can exist, that it was the duty of the State Auditor to register them as prescribed by the statute (R. S. 1909, sec. 1275), for they were submitted to him after full compliance with the constitutional requirements applicable thereto.

## II.

In speaking of the assessment by which debts or bonds are limited, the provision, as has been shown, proportions the amount "by the assessment next before the last assessment for state and county purposes, *previous to the incurring of such indebtedness.*" This last phrase refers and can only refer "to the last assessment" for State and county purposes which occurs immediately before it. The slightest glance will disclose this fact. It constitutes the constitutional method of defining and pointing out and making certain the particular as-

**Previous Assessment.**

sessment upon which the bonds are to be based, by describing *it* as one *next* before the last assessment which preceded the incurring of the indebtedness. I cannot conceive how the expression, "previous to the incurring of such indebtedness," can describe or refer to any other language than that which immediately preceded it and from which it is only separated by a comma. Hence, I am unable to follow the suggestion in the learned principal opinion that this phrase "has reference to the time when the constituted authority of a subdivision is required to ascertain whether the proposed indebtedness exceeds the constitutional limit, and not to the time when such debt, if authorized, will become obligatory." If this suggestion is feasible, which I cannot conceive, still it could not be practically applied, in my opinion, for I fail to discover any other language in any part of the constitutional amendment, than that to which the phrase is now connected, with which it could be joined in the way above suggested.

I think this phrase is an integral part and qualifier of the language which precedes it. It occurs in the same form and identical connection in the constitutions of sister States, and all the courts which have reviewed it have uniformly held it to particularize that "assessed valuation" which must immediately precede the incurrence of the indebtedness, the only difference between those States and our State being that in them the last "assessed valuation" before the debt is contracted, is also the basis of its validity; while under our Constitution, it is the next to last "assessed valuation" which is the limit of indebtedness. This correct view is also taken by the learned Attorney-General; for in his brief, page 17, he says: "The sole question involved in this case, viz., whether the limitation of indebtedness applies as of the date of the election authorizing the issue or as of the date on which the bonds were actually issued. In other words, is the indebtedness incurred within the mean-

ing of these provisions at the time the bonds were voted or at the time they are issued?'' As has been been shown the uniform answer of the courts in this State, the Federal tribunals, and elsewhere is that the indebtedness is *not* incurred, in cases like the present, until bonds are both issued and sold.

### III.

The learned principal opinion, cites the case of Prickett v. City of Marceline, 65 Fed. 469. In that case the bonds were issued in July 2, 1890,
Cases Cited in Majority Opinion.
after a vote was taken in June, 1890. The court held, after a review of the law relating to the work of county assessment and that of the State Board of Equalization, that the assessment for the year of 1890 could not be completed before February, 1891, and hence necessarily the assessment to which the bond issue was referable was that of 1888, since that was next to the assessment of 1889, which was the last completed assessment previous to the incurring of the indebtedness, by the issue of the bonds on July 2, 1890. But the court expressly decided that the indebtedness was created on the date of July 2, 1890, when the bonds were issued and from the time the interest was paid. These were the only two points in judgment and each was decided in perfect accord with the authorities heretofore cited. Judge PHILIPS added his personal opinion in the following terms: ''So there must be at the time the debt is created, and I think, when his vote is given, two antecedent completed assessments next prior thereto.'' It is perfectly plain from this language that Judge PHILIPS ruled correctly as to the law applicable to the points involved, and that he distinguished therefrom his own view by the middle phrase, to-wit: ''And I think when his vote is given.'' If this clause is elided, then the foregoing statement of the law is accurate and correct, as it was intended to be, when made by the

learned judge, who carefully expressed his personal opinion in a form to distinguish it from the established rule, which he had applied in his judgment.'

The learned principal opinion states that this case was affirmed on appeal by the United States Circuit Court of Appeals. This is an inadvertency if it is intended to imply that any part of the reasoning of the opinion of Judge PHILIPS was reviewed or affirmed. When the judgment was appealed it was found by the appellate court that no exceptions whatever had been preserved, and that nothing was presented for review. The case was disposed of with a single remark, to-wit:

"PER CURIAM:—This case is affirmed on the authority of Searcy County v. Thompson, 66 Fed. 92." [Prickett v. Marceline, 69 Fed. 462.] The case cited in the *per curiam* held that where no exceptions were saved there was nothing to review. It is therefore evident that the learned principal opinion is in error if it conveys the idea that the personal views of Judge PHILIPS or any of his reasoning, have ever received the sanction of the United States Circuit Court of Appeals. On the contrary, that court and the three judges (CALDWELL, SANBORN and THAYER) who summarily disposed of the appeal from his judgment, by repeated subsequent opinons, have established the rule to be exactly the reverse of the *dicta* of Judge PHILIPS. The only case that gives any semblance of support to the principal opinion is Railroad v. Village of Wilber, 63 Neb. l. c. 627. An analysis of that case shows that it does not in fact support the opinion. It involved the construction of a local statute which permitted the city to create debts not beyond a certain per cent of its taxable property, "according to the last preceding assessment of property." These quoted terms were not modified or followed by the expression "previous to the incurring of such indebtedness" or similar

251 Mo.—21.

words. It was, therefore, totally unlike the constitutional provision in this and other states. Hence, no question arose as to the relativity of the last assessment to the time of the creation of the debt. And the court was at liberty to hold that the last assessment before the holding of the election was intended. Clearly no such construction would have been possible if the local act had contained words which had described the property assessment, as the one last previous to the making of the debt. The ruling is therefore inapposite and affords no support for the view of the principal opinion.

Two other cases are cited in the principal opinion. [Culbertson v. Fulton, 127 Ill. 30; Wilkinson v. Van Orman, 70 Iowa, 230.] The Illinois case is directly contrary to the theory for which it is invoked, as will appear from the following excerpt: "The Constitution provides that the value of the taxable property must be ascertained by 'the last assessment for State and county taxes previous to the incurring of such indebtedness.' Inasmuch as the indebtedness must be regarded as having been incurred at the *date* of contract, that is to say, August 15, 1887, we must ascertain the value of the taxable property, for the purposes of this case, from the assessment for State and county taxes for the year 1886, and not for the year 1887. This is so, for the reason that the equalized value of the assessable property in the city of Fulton for the year 1887 was not arrived at by the action of the State Board of Equalization until the first day of October, 1887. It is the assessment as fixed by the State board which must govern, and the State board did not fix such assessments until *after* August 15, the date of the incurring of the indebtedness."

It is plain that this decision is directly on the point involved in the present proceedings. It expressly holds that the terms *"previous to the incurring of such indebtedness"* refers to the *"date of the contract"*

whereby the indebtedness is created, and that as the "last assessment" had *not* been completed for *two* months thereafter, the validity of the indebtedness depended on the last completed assessment (with us the next before the last). That is the sole position I take in the present case. Here on October 1 and 2, 1912, when the indebtedness was incurred, the last assessment, for the year 1911, had been completed on September 1, 1912. This necessarily measured the validity of the present bonds by their constitutional ratio to the next prior assessment, or that of 1910; which it is admitted is large enough to justify the issuance of the bonds. This argument could not be more aptly or distinctly sustained than by the Illinois case.

The Iowa case also sustains my view. There the suit was to enjoin an issue of bonds because the assessment had not been equalized before the bonds "were proposed to be issued." There was a demurrer. The court held it should be overruled, because, under the Constitution of Iowa the right to issue bonds must be ascertained by the last completed assessment. This ruling is in accord with the principle which, I hold, governs the present case. Its application to the facts in this record proves that the assessment of 1910 is one which is called into play, because the undisputed facts are that the assessment of 1911 had been completely equalized and was in existence one month prior to the issuance of the bonds in question.

The only other case cited in the learned principal opinion is State ex rel. v. Cornwell, 40 S. C. 26. That case is also in accord with the consensus of opinions herein cited; it merely reiterates the rule that it is only completed assessments at the time the debt is created which can be looked to in measuring its amount. The court disposes adversely of the whole basis of the contention of the principal opinion by these words: "For it is admitted in the argument, and properly admitted, that the *time* when the debt *purports* to have

been contracted, is the *time* to which reference must be had in ascertaining whether the constitutional limit had been exceeded." [*Ibid*, 1. c. 27.] (Italics mine.)

It seems to me too plain for further argument that neither reason nor authority will permit any other view to be taken of our constitutional provisions limiting the extent to which public corporations may become indebted (which are in substance mere replicas of those of sister states) than, that the *"incurring of the indebtedness,"* in the sense of the law, takes place at the date when the contract is executed (in case of bonds the date of their issuance and sale). That the validity of the indebtedness depends, with us, upon the fact that it and all other indebtedness, is within ten per cent of the taxable property of the corporation, as shown by the assessment *next* before the last assessment which is *previous* to the time of the making of the contract, or of the issuance and sale of the bonds if the indebtedness is incurred in that form. That the obvious, natural, and common sense rule of interpretation prescribed by Mr. Story and uniformly practiced by all the courts, as well as the language of the Constitution, will not permit any other interpretation.

## IV.

In the case at bar the bonds were issued within thirty days *after* the assessment of 1911 had been finished, whereby the preceding assessment of 1910 had become the measure of the indebtedness evidenced by them. Beyond doubt this was prompt and seasonable action on the part of the city of Dexter, for, in many of the cases cited, the bonds authorized were not issued for more than a year after the assessment on which they were based had been completed. The law is, that constitutional or other legal rights, where no time is mentioned, must be exercised in a reasonable time and manner. Hence, in this case unreasonable delay in the issue of the bonds, or changed circumstances,

Timely Issue of Bonds After Election.

might entitled any taxpaying citizen to enjoin any further action on the part of the city. It is significant that no such attempt has been made. I know of no rule of law which would justify this court in deciding that these bonds should be denied registration because they were not issued until thirty days after the right to do so had accrued. [State ex rel. v. Gordon, 217 Mo. l. c. 122.]

I think the respondent should be commanded to register these bonds and the writ should go as prayed. *Graves* and *Faris, JJ.,* concur in this opinion.